## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN KO, Derivatively on Behalf of WARNER BROS. DISCOVERY, INC., | Case No: |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| DAVID M. ZASLAV, GUNNAR WIEDENFELS, SAMUEL A. DI PIAZZA, JR., LI HASLETT CHEN, RICHARD W. FISHER, PAUL A. GOULD, DEBRA L. LEE, KENNETH W. LOWE, JOHN C. MALONE, FAZAL MERCHANT, PAULA A. PRICE, and GEOFFREY Y. YANG, | |
| Defendants, | **JURY TRIAL DEMANDED** |
| and, | |
| WARNER BROS. DISCOVERY, INC., | |
| Nominal Defendant. | |

Plaintiff Kevin Ko ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Warner Bros. Discovery, Inc. ("WBD" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from February 24, 2024 through the present (the "Relevant Period") and have caused substantial harm to the Company.

## JURISDICTION

2.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise

purposefully availed themselves of this District through being listed on the Nasdaq in this District, issuing false statements in this District, and maintaining retail stores in this District.

5.      In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**THE PARTIES**

**Plaintiff**

6.      Plaintiff is, and was at relevant times, a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

7.      **Nominal Defendant WBD** is a Delaware corporation with principal executive offices located at 230 Park Avenue South, New York, New York 10003.  The Company's Series A common stock trades in an efficient market on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "WBD".

**Director Defendants**

8.      **Defendant David M. Zaslav** ("Zaslav") has served as the Company's President and Chief Executive Officer at all relevant times.

9.      **Defendant Samuel A. Di Piazza, Jr.** ("Di Piazza") has served as a director of the Company since 2022.  He also serves as the chair of the Board and as a member of the Audit Committee.

10.    **Defendant Li Haslett Chen** ("Chen") has served as a director of the Company since 2022. She also serves as a member of the Nominating and Corporate Governance Committee.

11.    **Defendant Richard W. Fisher** ("Fisher") has served as a director of the Company since 2022. He also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

12.    **Defendant Paul A. Gould** ("Gould") has served as a director of the Company since 2008. He also serves as chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

13.    **Defendant Debra L. Lee** ("Lee") has served as a director of the Company since 2022. She also serves as a member of the Compensation Committee.

14.    **Defendant Kenneth W. Lowe** ("Lowe") has served as a director of the Company since 2023. He also serves as a member of the Audit Committee and the Compensation Committee.

15.    **Defendant John C. Malone** ("Malone") has served as a director of the Company since 2008. He also serves as the chair of the Nominating and Corporate Governance Committee.

16.    **Defendant Fazal Merchant** ("Merchant") has served as a director of the Company since 2022. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

17.    **Defendant Paula A. Price** ("Price") has served as a director of the Company since 2022. She also serves as the chair of the Audit Committee.

18.    **Defendant Geoffrey Y. Yang** ("Yang") has served as a director of the Company since 2022. He also serves as a member of the Compensation Committee.

19.     Defendants Zaslav, Di Piazza, Chen, Fisher, Gould, Lee, Lowe, Malone, Merchant, Price, and Yang are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

20.     ***Defendant Gunnar Wiedenfels*** ("Wiedenfels") has served as the Company's Chief Financial Officer at all relevant times.

21.     Defendant Wiedenfels and Zaslav are collectively referred to herein as the "Officer Defendants."

22.     The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

23.     The Company is a global media and entertainment company that provides a portfolio of content, brands, and franchises across television, film, streaming, and gaming outlets. The Company operates through three reportable segments: Studios, Networks, and Direct-to-Consumer ("DTC").  The Networks segment primarily consists of its domestic and international television networks.

24.     The Company's television networks include, *inter alia*, TNT, which has relied on basketball programming to drive ratings and revenue since 1988, particularly through its U.S. sports rights agreements with the NBA.  Under its existing 2014 deal with the NBA, TNT paid an annual average fee of $1.2 billion.

25.     In 2024, the NBA entered advanced discussions with its various partners for a new round of media-rights deals that would last approximately a decade.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

26.    On February 23, 2024, when the Company issued a press release during pre-market hours reporting its fourth quarter and full year 2023 financial results (the "4Q/FY23 Earnings Release"). The 4Q/FY23 Earnings Release quoted Defendant Zaslav as stating that Defendants had purportedly "execut[ed] against [their] strategic plan to reposition the company," were "now on solid footing with a clear pathway to growth", and "ha[d] an attack plan for 2024 that includes . . . further progress against [their] long-range financial goals" such that Defendants "[we]re confident in [their] ability to drive sustained operating momentum and enhanced shareholder value."

27.    With respect to the Company's Networks segment, the 4Q/FY23 Earnings Release stated:

- Networks operating expenses decreased 7% ex-FX[1] to $2,829 million compared to the prior year quarter.  The AT&T SportsNet business exit favorably impacted the year-over-year growth rate by approximately 300 bps[.]

  - Costs of revenues decreased 7% ex-FX, primarily driven by lower international sports rights fees, including the transfer of TNT Sports Chile, exiting the AT&T SportsNet business, as well as lower domestic general entertainment content expense, partially offset by the impact of inflation in Argentina.

  - SG&A [selling, general, and administrative] expenses decreased 4% ex-FX, primarily driven by lower personnel expenses.'

28.    That same day, the Company hosted a conference call with investors and analysts to discuss the Company's fourth quarter and full year 2023 results (the "4Q/FY23 Earnings Call"). During his prepared remarks on the 4Q/FY23 Earnings Call, Defendant Zaslav asserted that "[o]ur top priority this year was to get this company on solid footing and on a pathway to growth, and

---

[1]    The Company's references to "ex-FX" in its financial statements refer to the exclusion foreign exchange rate effects.

we've done that"; that "[w]e've significantly enhanced the efficiency of the organization with a

long runway still to go"; that "[w]e are optimistic that the efforts we've undertaken on digital and

advanced advertising solutions . . . will enable us to achieve a more competitive profile"; and that,

"[b]ottom line, we're a far healthier company now," "we're building real momentum", "[a]nd we

expect 2024 will be a year to drive that momentum forward even further" notwithstanding "the

impacts of ongoing disruption in the pay-TV ecosystem and a dislocated linear advertising

ecosystem."

29.    With respect to the NBA and its content, Defendant Zaslav stated:

> Last weekend we saw great coverage and strong ratings at the NBA All-Star Game
> and All-Star Weekend. We have a strong positive 40-year relationship with the
> NBA. And in terms of our NBA rights, we are now fully engaged in renewal
> discussions, and they are constructive and productive. Our global sports portfolio
> continues to provide real meaningful value to all of our platforms.  We're proud to
> be the home of one of the most coveted collections of premium sports content in
> the industry, along with a best-in-class talent roster and exceptional production
> values.

30.    During the question-and-answer ("Q&A") phase of the 4Q/FY23 Earnings Call, an

analyst noted that it was "great news to hear [the positive news regarding] the NBA conversations",

which "[c]learly . . . would be a big positive to retain those rights", and asked "[h]ow do you think

about making that work financially for the company" given "that linear TV is under pressure on

the revenue side, and I think it's probably safe to say the NBA costs are going to go up", and "how

do you guys approach this from a kind of a P&L [profit and loss] point of view when you think

about exploiting the NBA for what I imagine will be another long-term deal?" Defendant

Wiedenfels responded:

> [O]n the NBA, as you know, we're in the middle of exclusive discussions here, so
> I want to lift it up maybe one level to a general statement on how we look at sports
> rights.  We're spending close to $20 billion sort of, on content and programming in
> the broadest sense, and every dollar we spend plays a different role across the
> portfolio. We generally like to own our content.  That's not the case with sports,

but we obviously acknowledge the enormous value, reach value, emotional value of these deals. And we have been able to strike profitable deals and we're always going to be disciplined. It's very easy to lose control over sports rights investments. That's not what we do. We're going -- we know exactly what value we assign and we stay disciplined during our discussions.

And if you take that into account, I think we have enormous opportunity to be much more efficient with our content spend overall across the entire company, and that will include certain areas in which, you're right, you probably have to assume that there is inflation going forward. On the NBA specifically, we've had a very, very strong partnership for 40 years, and I certainly hope that we're going to be able to continue that in the most positive way.

31.    Also, on February 23, 2024, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was reviewed, approved, and signed by Defendants Zaslav, Wiedenfels, Chen, Di Piazza, Fisher, Gould, Lee, Lowe, Malone, Merchant, Price, and Yang.

32.    With respect to the Company's 2023 goodwill impairment analysis, the 2023 10-K stated:

*2023 Impairment Analysis*

As of October 1, 2023, the Company performed a quantitative goodwill impairment assessment for all reporting units. The estimated fair value of each reporting unit exceeded its carrying value and, therefore, no impairment was recorded . . . . [T]he Networks reporting unit, which had headroom of 5%, . . . had fair value in excess of carrying value of less than 20%. The fair values of the reporting units were determined using a combination of DCF [discounted cash flow] and market valuation methodologies. Due to [inter alia] declining levels of global GDP growth, [and] soft advertising markets in the U.S. associated with the Company's Networks reporting unit . . . the Company will continue to monitor its reporting units for changes that could impact recoverability.

33.    In addition, the 2023 10-K contained generic, boilerplate representations regarding WBD's "invest[ment of] significant resources to acquire and maintain licenses to produce sports programming" and that "there can be no assurance that we will continue to be successful in our

efforts to obtain or maintain licenses to recurring sports events or recoup our investment when the

content is distributed" stating:

> We face significant competition to acquire and maintain licenses to sports
> programming, which leads to significant expenditure of funds and resources. As a
> result of an increasing number of market entrants in the programming space, we
> have seen upward pressure on programming costs in recent years, particularly in
> connection with the licensing and acquisition of sports content from third parties.
> We may also be impacted by such upward pressures driven by increasing
> investment in programming by competitors . . . . There can be no assurance that
> we will be able to compete successfully in the future against existing or new
> competitors to obtain and/or maintain licenses to recurring sports events, or that
> increasing competition for programming licenses . . . will not have a material
> adverse effect on our business, financial condition or results of operations.
>
> There can also be no assurance that we will recoup our investment in sports
> programming, including realizing any anticipated benefits of our joint ventures.
> The impact of these contracts on our results of operations over the term of the
> contracts depends on a number of factors, including the strength of advertising
> markets and subscription levels and rates for programming. Our success with sports
> programming is highly dependent on consumer acceptance of this content and the
> size of our viewing audience.

34.    The foregoing risk warning was a generic, catch-all provision that was not tailored

to the Company's actual known risks regarding its sports rights negotiations with the NBA, much

less that these negotiations were causing, or were likely to cause, the Company to significantly

reevaluate its business and goodwill.

35.    The 2023 10-K also contained generic, boilerplate representations regarding

WBD's potential future "recogni[ition of] . . . impairment charges related to goodwill and other

intangible assets", while simultaneously downplaying the likelihood of the same, stating:

> We have a significant amount of goodwill and other intangible assets on our
> consolidated balance sheet. In accordance with U.S. GAAP, management
> periodically assesses these assets to determine if they are impaired. Significant
> negative industry or economic trends, including the continued decline of traditional
> linear television viewership and linear ad[vertising] revenues, disruptions to our
> business, inability to effectively integrate acquired businesses, underperformance
> of our content, unexpected significant changes or planned changes in use of the
> assets, including in connection with restructuring initiatives, divestitures and

market capitalization declines **may** impair goodwill and other intangible assets. Any charges relating to such impairments **could** materially adversely affect our results of operations in the periods recognized. [Emphases added].

36.     This risk warning, too, was a generic, catch-all provision that was not tailored to the Company's actual known risks regarding impairments to its Networks segment's goodwill, much less that the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA, were likely to lead to billions of dollars in goodwill impairment charges.

37.     Appended as exhibits to the 2023 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Officer Defendants each certified that the 2023 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

38.     On April 19, 2024, the Company filed its 2024 Proxy Statement on Schedule 14A with the SEC.  The 2024 Proxy Statement was solicited by each of the Director Defendants and sought shareholder approval for, *inter alia*: (i) the re-election of Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board of Directors; (ii) the compensation for certain named executives on an advisory basis; and (iii) the amended and restated stock incentive plan.

39.     The 2024 Proxy Statement stated the following, in relevant part:

**Board Role in Risk Oversight**

The Board has overall responsibility for overseeing risk management at WBD and has delegated functional oversight for certain risks to each of the three standing Board committees, as highlighted in the chart below. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board is regularly informed about such risks through committee reports and other presentations. Senior management is responsible for developing and implementing the Company's financial and strategic plans and identifying, evaluating, managing, and mitigating the risks inherent in those plans. Our Board is responsible for overseeing those plans, the associated risks, and the steps that senior management is taking to manage and mitigate risks.

\*\*\*

**Our Board of Directors**

Our Board has general oversight responsibility for the Company's affairs pursuant to the Delaware General Corporation Law and the Company's Second Restated Certificate of Incorporation and Bylaws. In exercising its fiduciary duties, the Board represents and acts on behalf of the Company's stockholders and is committed to strong corporate governance, as reflected through its policies and practices. The Board is deeply involved in the Company's strategic planning process, leadership development, succession planning, and oversight of risk management.

\*\*\*

**Corporate Governance**

Our corporate governance practices are established and monitored by our Board. Our Board regularly assesses our governance policies in light of legal requirements and governance best practices.

\*\*\*

The Company has implemented strong corporate governance practices that ensure the Board is accountable to our stockholders and serves their best interests.

40.    The foregoing statements in the 2024 Proxy Statement were materially false and misleading because the Director Defendants did not effectively "oversee[] risk management at WBD" nor were the Company's corporate governance practices "strong." The 2024 Proxy Statement also failed to disclose that: (i) the Company's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly reevaluate its business and

goodwill; (ii) the Company's goodwill in its Networks segment had significantly deteriorated as a result of the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (iii) the foregoing significantly increased the likelihood of the Company incurring billions of dollars in goodwill impairment charges; (iv) accordingly, Defendants had overstated the Company's overall business and financial prospects; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times. As the Director Defendants knew, or should have known in the exercise of prudent business judgment, the foregoing, these statements are half-truths, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20.

41.     On April 22, 2024, the Company's exclusive sports rights negotiating window with the NBA expired without a deal, allowing the NBA to negotiate with other companies for its sports rights content, including, *inter alia*, NBC, which offered to pay an annual average fee of $2.5 billion, and Amazon, which offered to pay an annual average fee of $1.8 billion.

42.     On May 9, 2024, the Company issued a press release reporting its first quarter 2024 financial results (the "1Q24 Earnings Release").  The 1Q24 Earnings Release quoted Defendant Zaslav as stating that "[w]e are pleased with our progress in the first quarter as evidenced by strong results in important [key performance indicators]" and that "[w]e continue to make bold moves to transform our company for the future as we position ourselves to take full advantage of the opportunities ahead."

43.     With respect to the Company's Networks segment, the 1Q24 Earnings Release stated, *inter alia*:

- Networks operating expenses decreased 8% ex-FX to $3,006 million compared to the prior year quarter. The AT&T SportsNet exit favorably impacted the growth rate by approximately 300 bps[.]

  - Costs of revenues decreased 8% ex-FX, primarily driven by the AT&T SportsNet exit, the allocation of U.S. sports costs to DTC, as well as lower general entertainment content expense. These benefits were partially offset by the timing of domestic sports rights expense, unfavorable inflationary impacts in Argentina, and higher election expenses. The AT&T SportsNet exit favorably impacted the growth rate by approximately 300 bps.

  - SG&A decreased 8% ex-FX, primarily driven by lower overhead expenses.

44.    The same day, the Company hosted a conference call with investors and analysts to discuss the Company's first quarter 2024 results (the "1Q24 Earnings Call").  During his prepared remarks on the 1Q24 Earnings Call, Defendant Zaslav repeatedly touted the Company's purported "confiden[ce]" in their assets, stating that "we're very confident in the strength of our assets and believe we will see both strategic and financial progress in the quarters ahead"; and that "we're more confident than ever in our assets and our playbook."

45.    With respect to the Company's negotiations with the NBA, Defendant Zaslav stated:

> We've enjoyed a strong partnership with the NBA for almost four decades. We're in continuing conversations with them now, and we're hopeful that we'll be able to reach an agreement that makes sense for both sides.
>
> We've had a lot of time to prepare for this negotiation, and we have strategies in place for the various potential outcomes.  However, now is not the time to discuss any of this. Since we are in active negotiations with the league and under our current deal with the NBA, we have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them. With that in mind, please understand that this is as much as we're prepared to say about this topic today.

46.    Defendant Wiedenfels, during his prepared remarks on the 1Q24 Earnings Call, highlighted that the Company "continued [to] benefit from [*inter alia*] the [Company's] many initiatives to improve working capital, which we are still in the early innings of realizing", a "more

disciplined and analytical approach to content investment and allocation", and "meaningfully lower cash restructuring costs."

47.    With respect to advertising trends, Defendant Wiedenfels stated, in relevant part, that "we did see sequential improvement [in] linear [markets] . . . in the first quarter" and "[t]otal company advertising in Q1 was down 7%, a sequential improvement of 300 basis points," as well as asserted that Defendants "expect another record quarter in Q2", which, "in part, reflects an increasingly more holistic portfolio approach to monetizing viewership on [*inter alia*] linear . . ., supporting our ability to offer our partners incremental reach and more customized ad[vertising] solutions spanning all platforms, particularly in the US."

48.    During the Q&A phase of the 1Q24 Earnings Call, in response to an analyst's inquiries regarding the Company's "restructuring while navigating through the massive industry changes" and, "from a WBD point of view, what do you think the biggest surprises will be", as well as whether Defendants "can . . . give us your outlook for both sides, both [DTC] and linear", Defendant Zaslav stated:

> [F]or us, it's really two tiers. One is we got rid of a lot of content we didn't think was going to help us. But at the same time, we brought in a lot of great creatives and invested a lot of content.  So it's, how do we run these businesses efficiently for real free cash flow and drive for growth?  But two, creative excellence. How do we have the best content?
>
> In this past year, HBO had maybe its best year ever, and in addition to that, Warner Brothers Television has some of the best, highest quality TV production, and we're looking at our motion picture business now, which we're feeling really good about. It's number one to start the year, but we have a lot of great content. So I think it's that combination.
>
> Great content, great creatives, fighting to tell the best stories on every platform, and the running it like a real business. Real free cash flow and real EBIT [earnings before interest and taxes], and I think those two will drive us for the future.

49.    In response to these same inquiries, Defendant Wiedenfels stated:

I would . . . say that we're operating in a much more constructive environment this year than we did last year.  So hopefully, that'll be supportive.

To your point . . . about the differentiation between D2C and linear, well really one of the things that's working very well right now is that convergence.  The way . . . the team take our inventory to the market is fully harmonized now.  It's across platforms, incremental reach.  We're leaning in further.

\*\*\*

Longer term, there is definitely more opportunity here.  We have been very transparent about the significant monetization difference between linear and digital advertising.  [Defendant Zaslav] talked about AI a couple of minutes ago.  Certainly that should be a helper longer term as we think about our go-to-market here, so definitely some upside.

\*\*\*

We're seeing how we're running the company fundamentally differently that's not reflected in our current and near-term financials, and I think that's going to be the surprises.

50.    Also, on May 9, 2024, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2024 (the "1Q24 10-Q").  With respect to the Company's goodwill and intangible assets impairment analysis for the quarter, the 1Q24 10-Q stated:

During the three months ended March 31, 2024, the Company performed goodwill and intangible assets impairment monitoring procedures for all of its reporting units and identified no indicators of impairment or triggering events.  As of October 1, 2023 . . . the Networks reporting unit, which had headroom of 5%, . . . had fair value in excess of carrying value of less than 20%. The Company will continue to monitor its reporting units for triggers that could impact recoverability of goodwill. These triggers include, but are not limited to, continued decline in the Company's market capitalization; affiliate and sports rights renewals, including the NBA, associated with the Company's Networks and DTC reporting units; [and] declining levels of global GDP growth and soft advertising markets in the U.S. associated with the Company's Networks reporting unit[.]

51.    In addition, the 1Q24 10-Q contained substantively the same boilerplate risk warnings as referenced above, *supra*, regarding the Company's "invest[ment of] significant

resources to acquire and maintain licenses to produce sports programming" and that "there can be no assurance that we will continue to be successful in our efforts to obtain or maintain licenses to recurring sports events or recoup our investment when the content is distributed", while acknowledging that "our license for NBA programming is currently subject to renewal, and our exclusivity period with the NBA has expired" and, "[a]s a result, we face increased competition to license content from the NBA, which could result in significantly higher programming costs to us or a failure to maintain our license for NBA programming."

52.    This risk warning was a generic, catch-all provision that was not tailored to the Company's actual known risk that its negotiations with the NBA were causing, or were likely to cause, the Company to significantly reevaluate its business and goodwill.

53.    Likewise, the 1Q24 10-Q continued to provide boilerplate risk warnings regarding the Company's potential future "recogni[ition of] . . . impairment charges related to goodwill and other intangible assets", while simultaneously downplaying the same, stating:

> We have a significant amount of goodwill and other intangible assets on our consolidated balance sheets. In accordance with U.S. GAAP, management periodically assesses these assets to determine if they are impaired . . . . The occurrence of certain events or circumstances could result in a downward revision in the estimated fair value of a reporting unit or intangible assets. For example, continued negative industry or economic trends, including the decline of traditional linear television viewership and linear ad[vertising] revenues, declining levels of global GDP growth and soft advertising markets in the U.S., disruptions to our business, inability to effectively integrate acquired businesses, execution risk associated with anticipated growth in our DTC products, underperformance of our content, failure to renew content licenses and distribution agreements, including affiliate and sports rights renewals (including the NBA), unexpected significant changes or planned changes in use of the assets, including in connection with restructuring initiatives, divestitures and continued decline in our market capitalization *could* negatively affect our estimates of the fair value of our reporting units. When events or changes in circumstances such as this occur, we have needed to, and *may* in the future need to, write-down the value of our goodwill and other intangible assets. *If* we determine that our estimate of the fair value of a reporting unit is below the recorded value of that unit on our balance sheet, we *may* record a non-cash impairment loss for the goodwill. Any charges relating to the impairment

of our goodwill and other intangible assets **could** materially adversely affect our results of operations in the periods recognized.

We consider all current information when determining the need for, or calculating, any impairment loss. However, future changes in events or circumstances, such as a continuation or worsening of the current negative industry and economic trends and the other events and circumstances described above, **could** result in decreases in the fair value of our goodwill and other intangible assets and require us to record additional impairment losses that **could** materially adversely affect our results of operations in the periods recognized.

54. This risk warning, too, was a generic, catch-all provision that was not tailored to the Company's actual known risks regarding impairments to its Networks segment's goodwill, much less that the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA, had significantly deteriorated the Networks segment's goodwill to such an extent that the Company was likely to record billions of dollars in goodwill impairment charges in a matter of months.

55. Appended as exhibits to the 1Q24 10-Q were substantively the same SOX certifications as referenced above, *supra*, signed by the Officer Defendants.

56. The statements referenced above were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly reevaluate its business and goodwill; (ii) the Company's goodwill in its Networks segment had significantly deteriorated as a result of the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (iii) the

foregoing significantly increased the likelihood of the Company incurring billions of dollars in goodwill impairment charges; (iv) accordingly, the Individual Defendants had overstated the Company's overall business and financial prospects; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

57.    In addition, the Company's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations. Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required the Company to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered." The Individual Defendants' failures to disclose that the Company's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly reevaluate its business and goodwill, as well as that the Company's goodwill in its Networks segment had significantly deteriorated to such an extent that the Company was likely to record billions of dollars in goodwill impairment charges, violated Item 105 because this issue represented a material factor that made an investment in the Company speculative or risky.

58.    For similar reasons, the Individual Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The Individual Defendants' failures to disclose that the Company's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly reevaluate its business and goodwill, as well as that the Company's goodwill in its Networks segment had

significantly deteriorated to such an extent that the Company was likely to record billions of dollars in goodwill impairment charges, violated Item 303 because this issue represented a known trend or uncertainty that was likely to have a material unfavorable impact on the Company's business and financial results.

**THE TRUTH EMERGES**

59.     On August 7, 2024, the Company issued a press release reporting its second quarter 2024 financial results (the "2Q24 Earnings Release").  Among other items, the Company reported disappointing revenue of $9.71 billion, representing a 6.3% Y/Y decrease and missing consensus estimates by $360 million; as well as a net loss of approximately $10 billion resulting from a $9.1 billion non-cash goodwill impairment charge from its Networks segment and $2.1 billion in other one-time accounting effects.  With respect to the Company's reported net loss during the quarter, the 2Q24 Earnings Release stated:

> Net loss available to [WBD] was $(10.0) billion, which includes a $9.1 billion noncash goodwill impairment charge from the Networks segment, as well as $2.1 billion of pre-tax acquisition-related amortization of intangibles, content fair value step-up, and restructuring expenses.
>
> • The goodwill impairment was triggered in response to the difference between market capitalization and book value, continued softness in the U.S. linear advertising market, and uncertainty related to affiliate and sports rights renewals, including the NBA.

60.     That same day, the Company hosted a conference call with investors and analysts to discuss its second quarter 2024 results (the "2Q24 Earnings Call").  On the 2Q24 Earnings Call, Defendant Wiedenfels stated:

> Little more color on the Goodwill impairment.  And to get straight to the point here, there is no one factor that is driving this impairment.  So the way this works is obviously with the amount of goodwill that we have, there's a systematic process that we go through every quarter and we're monitoring for so-called triggering events.

***And this is clearly where a sports right discussion like the one with the NBA comes into play as a triggering event, which then compels us to re-evaluate our business case*** in a strategic planning process with the latest assumptions, the best view of where the industry is and how we play in that field. ***And that's what then leads to evaluation, which in the second quarter happened to be $9.1 billion below what was on the books for the network segment.*** So it's really a full re-evaluation, not a response to one individual factor.  [Emphases added].

61.     Following the 2Q24 Earnings Release and the 2Q24 Earnings Call, the Company's stock price fell $0.69 per share, or 8.95%, to close at $7.02 per share on August 8, 2024.

## DAMAGE TO THE COMPANY

**Securities Class Action**

62.     On November 25, 2024, a securities class action complaint was filed in the United States District Court for the Southern District of New York against the Company the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Collura v. Warner Bros. Discovery, Inc., et al.*, Case No. 1:24-cv-09027 (S.D.N.Y.) (the "Securities Class Action").

63.     As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers.  The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**Unjust Compensation**

64.     At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

65.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

66.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

67.     In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

68.     The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

69.     The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

**CORPORATE GOVERNANCE**

70.    At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

71.    Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Ethics**

72.    At all relevant times, the Company had in place its Code of Ethics which "applies to all directors, offices, executives and employees of Warner Bros. Discovery and its subsidiaries…." From the outset, the Code of Ethics makes clear that "Integrity Matters," stating:

> When we conduct business ethically, we send a message to our consumers, business partners, shareholders and other stakeholders that they can put their trust in us. By doing the right thing, we not only protect our reputation, but we also help Warner Bros. Discovery, Inc. ("Warner Bros. Discovery" or "the Company") thrive.
>
> To that end, we have created this Code of Ethics ("Code"). It provides standards for: ensuring compliance with applicable laws, regulations and Company policies; promoting integrity and the highest standards of ethical conduct; and helping us avoid even the appearance of anything improper in our business activities.

73.    In a section entitled "Complying with Laws and Regulations," the Code of Ethics states:

> Complying with the law is the minimum standard for ethical conduct and we are committed to full compliance with all laws and regulations that apply to our business. It is, however, impossible to anticipate every situation that might arise in the course of your day-to-day business activities. Therefore, the Code includes additional resources that are available to you as questions arise. As an employee, it is up to you to use good judgment and to seek help when necessary.

74.     In a section regarding "Reporting Concerns," the Code of Ethics states:

An issue cannot be addressed unless it is brought to someone's attention. It is therefore incumbent upon each of us to seek guidance when "the right thing to do" is unclear and to report legal or ethical concerns when they arise.

Your manager is a good starting point for any questions or concerns you might have about the Code or other Company policies. However, if you're uncomfortable speaking with your manager for any reason, you should:

•       Contact another member of management (and it does not have to be someone in your direct line of reporting);

•       Contact your People & Culture partner;

•       Contact the Ethics & Compliance Office; and/or

•       Call the ethics hotline (the "Hotline") toll-free at 800-398-6395 or access the Hotline website (wbd.ethicspoint.com). The Hotline website lists toll-free numbers for all locations in which the Company has offices. Anonymous reports will be accepted where permitted by law.

The Company will make every reasonable attempt to ensure that your concerns are addressed appropriately. Reports from employees outside the U.S. may be subject to the laws of the country in which the employee works. The Company will handle all reports, including anonymous reports, in accordance with local privacy regulations and other applicable laws.

75.     In a section entitled "Integrity of Financial Records and Public Disclosure," the

Code of Ethics states:

Our financial records serve as a basis for managing our business and fulfilling our responsibilities to shareholders, our employees and other stakeholders. The integrity of our financial records is also important to our compliance with accounting, tax and public disclosure laws and regulations and other requirements.

We are committed to maintaining accurate and complete financial records and to full, fair, accurate, timely and understandable disclosure in reports and documents that are filed with the U.S. Securities and Exchange Commission and other regulatory bodies or are otherwise made publicly available.

Individually, we are all responsible for recording clear, accurate and honest information in all Company records that we produce, such as expense reports, financial statements and public disclosure documents.

If you have any concerns about questionable accounting or audit matters, you should immediately contact the Ethics & Compliance Office or Internal Audit. You may submit your concerns anonymously where permitted by law. It is essential for the Company to learn about possible accounting or audit concerns so we can investigate them promptly. When in doubt, speak up. The Company does not tolerate any acts of retaliation for good faith reports of accounting or audit concerns

76.     The Code of Ethics further gives "Examples of questionable accounting/audit matters" as follows:

•      Fraud or deliberate error in the preparation or audit of any financial statement or record.

•      Deficiencies or noncompliance with the Company's internal accounting controls.

•      Misrepresentations or false statements contained in Company's financial or audit records or reports.

•      Other deviation from full and fair reporting of the Company's financial condition.

77.     In a section regarding "Communicating with the Public," the Code of Ethics states:

We are committed to maintaining honest, professional and lawful internal and public communications and recognize the need for a consistent voice when issuing statements about the Company or providing information to the public. For this reason, it is important that only authorized persons speak on behalf of Warner Bros. Discovery. Communications with media, investors, stock analysts and other members of the financial community should be referred to Corporate Communications and/or Investor Relations.

**Full, Fair and Timely Disclosures**

As a public company, we are committed to meeting our obligations of full, fair and timely disclosure in all reports and documents that describe our business and financial results, and other public communications.

**Remember:**

•      Do not speak in public (for example, on a panel) about the Company or write articles about your work at Warner Bros. Discovery for professional journals without the prior approval of Corporate Communications.

•      Do not speak "off the record" to journalists or analysts who ask you for information about the Company or our business partners without the prior approval of Corporate Communications.

•      Avoid the temptation to use your title or affiliation outside of your work for the Company without making clear that the use is for identification only.

**Audit Committee Charter**

78.     At all relevant times, the Company has had in place its Audit Committee Charter

which sets forth the additional duties and responsibilities of the Audit Committee. The Audit

Committee Charter states in relevant part:

> The purpose of the Audit Committee as set forth in this charter (the "Charter") is to provide assistance to the Board in fulfilling the Board's responsibilities to the Company and its stockholders relating to the accounting, financial reporting process, internal controls and the audit of the Company's financial statements. The Audit Committee will generally oversee management's processes and activities relating to:
>
> •      maintaining the reliability and integrity of the Company's accounting policies, internal controls, financial reporting practices and financial statements;
> •      the independent auditor's qualifications and independence;
> •      the performance of the Company's internal audit function and independent auditor;
> •      confirming compliance with U.S. Federal securities laws and regulations, and the requirements of any stock exchange or quotation system on which the Company's securities may be listed; and
> •      public disclosures related to environmental, social and governance ("ESG") matters.
>
> ***
>
> **AUTHORITY AND RESPONSIBILITIES**
>
> The Audit Committee will have all the powers of the Board necessary or desirable to perform those functions and responsibilities set forth in this charter, in each case to the full extent that those powers may be delegated to a committee of the Board under Delaware law.  The Committee believes that its policies and procedures should remain flexible, in order to facilitate its ability to respond to changing circumstances and conditions in fulfilling its responsibilities to the Company and its stockholders.

The Committee shall have such duties as may be delegated from time to time by the Board including the following functions and responsibilities:

*Oversight of Independent Auditor*

A.   Engagement. The Committee shall be solely responsible for appointing, evaluating, retaining and, when necessary, terminating the engagement of the independent auditor. The Committee may, in its discretion, seek stockholder ratification of the independent auditor it appoints. The Committee will approve all audit engagement fees and terms and significant permitted non-audit engagements with the independent auditor.

B.   Independence. The Committee shall take, or recommend that the full Board take, appropriate action to evaluate and oversee the independence of the independent auditor. In connection with this responsibility, the Committee shall obtain and review the written disclosures and the letter from the independent auditor required by applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB") regarding the independent auditor's communications with the Committee concerning independence. The Committee shall actively engage in dialogue with the independent auditor concerning any disclosed relationships or services that might impact the objectivity and independence of the auditor. The Committee shall also consider whether the provision of permitted non-audit services is compatible with maintaining the auditor's independence.

C.   Oversight. The Committee will be directly responsible for the oversight of the work of the independent auditor (including resolution of disagreements between management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attestation services. The independent auditor will report directly to the Committee. In connection with its oversight role, the Committee shall, from time to time as appropriate, receive and consider the reports and other communications required to be made by the independent auditor regarding:

   •   critical accounting policies and practices;

   •   alternative treatments within generally accepted accounting principles for policies and practices related to material items that have been discussed with Company management, including ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor;

   •   other material written communications between the independent auditor and Company management; and

26

     •    all other matters required to be communicated by the independent auditor to the Committee under the standards of the PCAOB, including AS 1301: Communications with Audit Committees ("AS 1301").

D.     Fee Approval. The Committee shall approve in advance all auditing services and permitted nonaudit services (including the fees and terms thereof) to be performed for the Company by its independent auditor, subject to the de minimus exceptions for non-audit services described in Section 10A(i)(l)(B) of the Exchange Act which are approved by the Committee prior to the completion of the audit. The Committee may delegate authority to one or more members to grant pre-approvals of audit and permitted non-audit services. In addition, the Chair of the Committee shall have authority to pre-approve audit and permitted non-audit services up to an amount established by the Committee on at least an annual basis. Any pre-approvals granted by the Chair or pursuant to such delegated authority will be presented to the entire Committee at its next scheduled meeting.

E.     Compensation. The Committee shall have sole and direct responsibility for setting the compensation of the independent auditor. The Committee is empowered, without further action by the Board, to cause the Company to pay the compensation of the independent auditor established by the Committee.

*Financial Statement and Disclosure Matters*

F.     Audited Financial Statements. The Committee shall review and discuss with management and the independent auditor the Company's annual audited financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the results of the independent auditor's review of the annual audited financial statements, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

G.     Interim Financial Statements. The Committee shall review and discuss with management and the independent auditor the Company's quarterly financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of the Company's Forms 10-Q, including the results of the independent auditor's review of the quarterly financial statements.

H.     Review of Financial Disclosures. The Committee shall review and discuss with management and the independent auditor, as applicable, (A)

significant issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (B) analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements; (C) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; (D) any other financial disclosures prior to their inclusion in the Company's Form 10-K or Forms 10-Q to determine that management and the independent auditor are satisfied with the disclosure and content of the financial statements to be presented; and (E) earnings press releases prior to their public release, including the use of non-GAAP financial measures, as well as financial information and earnings guidance (generally or on a case-by-case basis) provided to analysts and rating agencies.

I.    Review of Independent Auditor Reports. The Committee shall, at least quarterly, review and discuss reports from the independent auditor on (A) all critical accounting policies and practices to be used;(B) all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and treatments preferred by the independent auditor; and (C) other material written communications between the independent auditor and management, such as any material or significant control recommendations or schedule of unadjusted differences.

J.    Audit Committee Report. The Committee shall prepare the Audit Committee report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

*Controls and Procedures*

K.    Risk Management. The Committee shall discuss with management the Company's significant business risk exposures including those related to (i) financial reporting and accounting risk, (ii) legal and regulatory risk, (iii) cybersecurity and information technology risk, and (iv) the steps management has taken to monitor and control such risk exposures, including the Company's risk assessment and risk management policies or guidelines. As appropriate, the Committee shall review such matters with the Board.

L.    Review of Conduct of Audit. The Committee shall review and discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61. (Codification of Statements on Auditing Standards, AU § 380, as amended) relating to the conduct of the audit or any review services, including any difficulties encountered in the course of the audit or review work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

M.    Certifications.  The Committee shall review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10- K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

## Corporate Governance Guidelines

79.    All relevant times, the Company also had in place its Corporate Governance Guidelines. The Corporate Governance Guidelines state, in relevant part:

The Board of Directors (the "Board") of Warner Bros. Discovery, Inc. (the "Company") has adopted these Corporate Governance Guidelines (the "Guidelines") to assist the Board in the exercise of its duties and responsibilities and to serve the best interests of the Company and its stockholders. The Guidelines should be applied in a manner consistent with all applicable laws and stock exchange rules and the Company's certificate of incorporation and bylaws, each as amended and in effect from time to time. The Guidelines are intended to serve as a flexible framework for the conduct of the Board's business and not as a set of legally binding obligations. The Board may modify or make exceptions to the Guidelines from time to time in its discretion and consistent with its duties and responsibilities to the Company and its stockholders.

**1.    ROLES OF MANAGEMENT AND THE BOARD**

The Company's officers and employees, under the direction of its Chief Executive Officer ("CEO") and the oversight of the Board, conduct the Company's business with the goal of enhancing the long-term value of the Company for the benefit of its stockholders. The Board is elected by the stockholders to oversee the management of the Company and to help assure that the interests of the stockholders are served.

\*\*\*

29

### 3.    DIRECTOR RESPONSIBILITIES

a)  Oversee Management of the Company. The Board believes that the primary responsibilities of directors are to exercise their business judgment in good faith, to act in what they reasonably believe to be the best interest of all stockholders, and to ensure that the business of the Company
is conducted so as to further the long-term interests of its stockholders. The Company's business and affairs are managed under the Board's direction rather than managed by the Board. The Board performs its oversight function in a manner that respects the distinct roles of the Board and management so as not to disrupt the Company's day-to-day operations.

b) Board, Committee and Stockholder Meetings. Directors are responsible for attending Board meetings, meetings of committees on which they serve and the annual meeting of stockholders, and devoting the time needed, and meeting as frequently as necessary, to discharge their responsibilities properly. Directors are expected to review all materials provided at or in advance of meetings of the Board and its committees. Each director should be sufficiently familiar with the business of the Company to facilitate active and effective participation in the deliberations of the Board and of each committee on which he or she serves.

c) Confidentiality. The proceedings and deliberations of the Board and its committees are confidential. Each director should maintain the confidentiality of information received in connection with his or her service as a director.

### <u>DUTIES OF THE DIRECTOR DEFENDANTS</u>

80.    As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

81.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

82.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and

good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

83.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

84.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate

system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

85.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

86.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.    As a result, the Company has expended, and will continue to expend, significant sums

of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

87.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

88.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

89.     Plaintiff is a current owner of the Company's stock and has continuously been an owner of Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

90.     Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

91.     The Company Board is currently comprised of twelve (12) members – including Defendants Zaslav, Di Piazza, Chen, Fisher, Gould, Lee, Lowe, Malone, Merchant, Price, Yang, and Non-Party Daniel E. Sanchez ("Sanchez").  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, six (6), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

92.     Each of the Director Defendants face a likelihood of liability in this action because

they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

93.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

94.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

95.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

96.    As a trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

97.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

98.     Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

99.     Each of the Director Defendants solicited the proxy statements containing the false and misleading statements, as discussed *supra*, which obtained their re-election to the Board, thus enabling them to continue breaching their fiduciary duties to the Company. As each Director Defendant benefitted, either directly or indirectly, from the false and misleading proxy statements, they are incapable of considering a demand to sue.

100.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

101.    Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**THE DIRECTOR DEFENDANTS ARE
<u>NOT INDEPENDENT OR DISINTERESTED</u>**

**Defendant Zaslav**

102.    Defendant Zaslav is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Zaslav cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

103.    As CEO, Defendant Zaslav also fails the Nasdaq bright-line independence test as set forth in Nasdaq Listing Rule 5605(a)(2) and cannot, therefore, be considered independent, as admitted by the Company in its 2024 Proxy Statement. As such, Defendant Zaslav could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Zaslav is therefore futile.

104.    Defendant Zaslav also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Zaslav is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

105.    In addition, Defendant Zaslav receives lucrative compensation in connection with his employment with the Company. Defendant Zaslav is not independent from Defendants Fisher, Gould, Lee, Lowe, and Yang as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Zaslav. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO

and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Zaslav could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

106.    Furthermore, as reported in the Company's 2024 Proxy Statement, Defendant Zaslav's daughter was employed by the Company as a producer for CNN. Thus, Defendant Zaslav could not take action against the Individual Defendants which could, in turn, adversely impact his daughter and her livelihood.

107.    Because of Defendant Zaslav's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Zaslav is unable to comply with his fiduciary duties and prosecute this action. Defendant Zaslav is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendants Price, Merchant, Lowe and Di Piazza**

108.    During the Relevant Period, Defendants Price, Merchant, Lowe, and Di Piazza served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia,* overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

109.    Defendants Price, Merchant, Lowe and Di Piazza breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other

disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Price, Merchant, Lowe and Di Piazza each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Fisher, Lee and Yang**

110.    Defendants Fisher, Lee and Yang concurrently served as members of the board of AT&T, Inc. As such, Defendants Fisher, Lee, and Yang are each conflicted and incapable of considering a demand to sue one another as a result of their longstanding professional relationship which has been built over years of working together at AT&T.

**Defendants Gould and Malone**

111.    Defendants Gould and Malone are each conflicted and lack the requisite independence to be able to consider a demand to sue as a result of their directorships with Liberty Global Ltd.

112.    First, Defendants Gould and Malone concurrently served as directors of Liberty Global and have built a longstanding professional relationship with one another. As such, Defendants Gould and Malone could not reasonably consider a demand to sue one another.

113.    Second, Liberty Global, according to the Company's 2024 Proxy Statement, is one of the Company's "large distributors." As such, Defendants Gould and Malone could not reasonably consider a demand to sue the Individual Defendants which could, in turn, adversely impact Liberty Global or Liberty Global's relationship with the Company.

**Defendant Lee**

114.    According to the Company's 2024 Proxy Statement, the daughter of Defendant Lee "was engaged by the Company during 2023 as a writer for a television program produced by

Warner Bros. Television." As such, Defendant Lee is conflicted and could not reasonably consider a demand to sue the Individual Defendants which, in turn, could have an adverse impact on her daughter or her daughter's livelihood.

**Additional Reasons Demand is Futile**

115.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

116.    The Company, at all material times, had its Code of Ethics and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Ethics and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

117.    In violation of the Code of Ethics, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Ethics, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile

as to them.

118.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

119.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

120.    Publicly traded companies, such as WBD, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

121.    Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence.

Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Against the Director Defendants for Violations of Section 14(a) of the Exchange Act)

122.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

124.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. 103.

125.    Under the direction and watch of the Director Defendants, the 2024 Proxy Statement failed to disclose that: (i) though the Company touted its "strong corporate governance practices," the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (ii) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not

adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

126.    The 2024 Proxy Statement also failed to disclose that: (i) the Company's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly reevaluate its business and goodwill; (ii) the Company's goodwill in its Networks segment had significantly deteriorated as a result of the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (iii) the foregoing significantly increased the likelihood of the Company incurring billions of dollars in goodwill impairment charges; (iv) accordingly, the Individual Defendants had overstated the Company's overall business and financial prospects; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

127.    As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

128.    In exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to the re-election of Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price and Zaslav.

129.    The false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price and Zaslav to the Board, which allowed them to continue to breach their fiduciary duties to the

Company.

130.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

## SECOND CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duties)

131.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

132.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

133.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

134.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent that: (i) the Company's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly reevaluate its business and goodwill; (ii) the Company's goodwill in its Networks segment had significantly deteriorated as a result of the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (iii) the foregoing significantly increased the likelihood of the Company incurring billions of dollars in goodwill impairment charges; (iv) accordingly, the Individual Defendants had overstated the Company's overall business and financial prospects; and (v) as a result, the Company's public

statements were materially false and misleading at all relevant times. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

135.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

136.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## THIRD CAUSE OF ACTION

### (Against the Individual Defendants for Gross Mismanagement)

137.    Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

138.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

139.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

140.    Because of the misconduct and breaches of duty alleged herein, the Individual

Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### (Against the Individual Defendants for Waste of Corporate Assets)

141.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

143.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions; and (iv) causing and/or permitting the Company to repurchase its own common stock at artificially inflated prices.

144.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## FIFTH CAUSE OF ACTION

### (Against the Individual Defendants for Unjust Enrichment)

145.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

147.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

148.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

### SIXTH CAUSE OF ACTION

#### (Against the Individual Defendants for Aiding and Abetting)

149.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

150.    The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

151.    Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

152.    The Officer Defendants, in violation of the Company's corporate governance,

engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders to secure, *inter alia*, the re-election of certain Director Defendants, by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

153.    As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

154.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

155.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

<u>**REQUEST FOR RELIEF**</u>

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, unjust enrichment, waste of corporate assets, and aiding and abetting;

C.    Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of Section 14(a) of the Exchange Act;

D.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 6, 2025

GAINEY McKENNA & EGLESTON

*/s/Thomas J. McKenna*

Thomas J. McKenna
Gregory M. Egleston
Christopher M. Brain
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com
Email: cbrain@gme-law.com

*Attorneys for Plaintiff*

**VERIFICATION**

 I, KEVIN KO, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Warner Bros. Discovery, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do no have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Warner Bros. Discovery, Inc. common stock at all relevant times.


*Kevin Ko*
_____
KEVIN KO